CHARLOTTE G. SERBER v. NEW LONDON CITY NATIONAL
BANK ET AL.

SUPERIOR COURT    NEW LONDON COUNTY    FILE No. 16066

Memorandum filed April 18, 1946.

*Samuel M. Gruskin, of New London, for the Plaintiff.*

*Foster K. Sistare* for New London City Bank, *Ralph R. Rakosky* and *Richard F. Corkey,* of New London, for the Defendants.

INGLIS, J. This is an interpleader action to determine the ownership of a savings account in the New London City National Bank standing in the names of Rebecca Goodman or Charlotte G. Serber, "payable to either or survivor." Those who claim the account are the plaintiff, Charlotte G. Serber, and the defendant, Ralph R. Rakosky, as administrator of the estate of Rebecca Goodman, who died April 7, 1944.

In January, 1943, Rebecca Goodman was the wife of one I. Goodman. They had five children, all adults. Those children were Nathan Goodman, Charlotte G. Serber, Sara Colt, Pauline Mann and Israel Goodman. None of the children were living at their parents' home of Blydenburg Avenue, New London, except that Pauline was there temporarily. Mrs. Goodman had been a chronic invalid for years. In January, 1943, the family were told that Mr. Goodman had only a few months to live. A

housekeeper was regularly employed, but it was felt desirable that, commencing in February, some one of the children should be in close enough touch with the situation to supervise the housekeeping in the home. Mrs. Serber seemed to be the one most available for this duty. Her husband had been a waiter in New York City and his earnings had not been large. I. Goodman owned a rather successful tailoring business which at that time was being managed by the son Nathan. Accordingly, it was arranged that Mr. Serber would be given employment in the tailoring business and that for the time being Mrs. Serber would spend her time between New York and New London, giving enough time in the latter place to supervise the home.

In early March Mr. Goodman conveyed a one-third interest in his business and the real property on which it operated to Mrs. Goodman and a like one-third interest to Nathan Goodman. On March 31, 1943, he died. After his death Mrs. Serber came to live full time with her mother, so that from then on the household consisted of Mrs. Goodman, Mr. and Mrs. Serber and their daughter, and the housekeeper, Mrs. Coleman. From time to time there were also various nurses there. There was no specific contract providing for any compensation for Mrs. Serber's services in supervising the household. She undertook the responsibility partly because she felt it was her duty to do so under all of the circumstances and partly because it would provide a home, rent free, and a living without cost for her and her family. Incidentally, in appreciation of her coming, her mother promised to give her a fur coat, which promise was later kept.

Mrs. Goodman was the beneficiary named in two insurance policies on the life of her husband. These two policies later yielded $11,371.06. Her other assets after the death of her husband consisted of a one-third interest in the business formerly conducted by him, which interest was then estimated to be worth about $11,000, and a one-third interest in his estate, which interest was worth about $10,500. She was drawing $100 per week from the business.

Nathan Goodman upon the death of his father became his mother's business adviser. He at first advised her to leave the proceeds of the policies with the insurance companies. She, however, expressed a preference to deposit the money in a

savings deposit in New London where it would be easily available to her in case she needed it. In this Nathan acquiesced, but suggested that, because of her enfeebled condition, the deposit be made in a joint account so that one other person could draw whatever money was needed. Because he was already managing the business, in which all of the family were interested, and because he did not wish the other children to think that he was assuming too much, he suggested that the deposit be made in the joint names of Mrs. Goodman and Mrs. Serber. To this Mrs. Goodman agreed. Accordingly, when the proceeds of one policy, amounting to $5,032.45, arrived, Nathan took the check to the defendant bank and told the teller that he wished to open a joint account in the names of Mrs. Goodman and Mrs. Serber. The teller handed him a signature card designed for use in what was commonly called a joint account but which in reality was an account payable to either or the survivor. This card was headed in the place for the name: "Goodman, Rebecca, or Serber, Charlotte G." In rather fine print the card set forth a purported agreement to the effect that the account should "be owned by them jointly, with the right of survivorship" and could be drawn by either of them or the survivor. This fine print provision was not read understandingly by either Nathan or Mrs. Goodman, nor by Mrs. Serber, before the card was signed by Mrs. Goodman and Mrs. Serber. It was signed by them and the initial deposit made on May 6, 1943. The passbook was issued by the bank with the heading: "Payable to either or survivor, Rebecca Goodman or Charlotte G. Serber."

At the time, the sole intention of the parties was to open an account in such a fashion that Mrs. Goodman's money might be withdrawn by Mrs. Serber alone in the event that occasion required for use in the support of the household. It was not Mrs. Goodman's intention to give Mrs. Serber any property rights in the account. Mrs. Goodman, Nathan and Mrs. Serber did not think particularly about the survivorship feature of the bank's records. They certainly did not understand nor intend that the balance in the account would be the property of Mrs. Serber on Mrs. Goodman's death. They just assumed that whatever was left in the account, after such withdrawal as might be made for the support of the household with Mrs. Goodman's consent, would remain the property of Mrs. Goodman.

That such was the intent of the parties at the time the account was opened and remained their intent until Mrs. Goodman's death is borne out by the events which followed the initial deposit. For example, Mrs. Goodman always insisted upon keeping the passbook in her exclusive possession. This was done because both she and Mrs. Serber understood that no withdrawals could be made without presenting the passbook. Still further, on May 10, a second deposit was made amounting to $4,726.11, this being the balance of the proceeds of the other insurance policy remaining after the purchase of some war bonds. Shortly thereafter, on an occasion when Mrs. Colt was discussing the arrangement with Mrs. Serber, the latter said: "God forbid, if anything should happen to Mother, I would never use the money."

In early July Mrs. Goodman was quite anxious that the family unite in a mutual distribution of Mr. Goodman's estate. Mrs. Serber at first agreed verbally to the proposed distribution, but then announced that she would not sign it. This provoked Mrs. Goodman exceedingly. At about the same time, one of the daughters pointed out to Mrs. Goodman that it would be possible for Mrs. Serber to withdraw all of the money on deposit and then move back to New York. Because of her alarm over this possibility and also because she was irritated by Mrs. Serber's conduct with reference to the mutual distribution, she directed Nathan to withdraw the whole account, and signed an order on the bank for such withdrawal. Nathan did on July 9 withdraw all of the money on deposit except $8.56, which was left by oversight. When Mrs. Serber heard of this withdrawal she became very angry, threatened to return to New York and actually packed her bags to do so. It is significant, however, that the burden of her complaint as she expressed it at the time was not that by withdrawing the deposit her mother was depriving her of her property or injuring her rights. It was simply that her mother had shown thereby that she no longer trusted her. At the time, Mrs. Goodman was not particularly perturbed about Mrs. Serber's threat to leave. She did, however, desire peace in the family, so she finally told Mrs. Serber that she was sorry she had withdrawn the money and that she would redeposit it, which she did on July 13, 1943. There is nothing to indicate that in making this redeposit she intended to give Mrs. Serber any greater rights in the deposit than she had previously had. On the contrary, it is clear that all she in-

tended and all Mrs. Serber expected was that the account was being restored to exactly the same status that had obtained prior to the withdrawal. That it had never been intended that Mrs. Serber should have any ownership of the account is pointed up by the fact that after the redeposit was made Mrs. Goodman made doubly sure that Mrs. Serber would not make any withdrawals. She did this by turning possession of the passbook over to Nathan. He kept it until after his mother's death, when he turned it over to her administrator.

After July 13, 1943, there was no further activity in the account except that, on November 16, 1943, $575 was withdrawn to pay for the fur coat which Mrs. Goodman had promised to give her daughter. At the date of Mrs. Goodman's death the balance in the account was $9199.79. At the present time it is $9264.79.

Neither at the time the account was opened nor at any time since has there been anything in the relationship between Mrs. Goodman and Mrs. Serber which would give rise to an intent on the part of the former to prefer the latter over the rest of her children to such an extent as the gift of this account would. The affection between the two in recent years had not been very great. It had not been as strong as that between Mrs. Goodman and her other children. Such an intent could not have been based on the fact that Mrs. Serber had come to oversee the household. As already pointed out, there were certain advantages to Mrs. Serber in that arrangement which would counter balance all of the trouble which it would cause her. There is no credible evidence that Mrs. Goodman ever promised Mrs. Serber that she would give her this money or any part of it in consideration of her services. Moreover, Mrs. Goodman, in the mutual distribution of her husband's estate, agreed that Mrs. Serber, on the ground that she was carrying the burden at home, should receive $8000, whereas the other two daughters received only $6000 apiece. If she had believed that Mrs. Serber was going to get the $9752 which was in this bank account at that time because she was rendering services at home, it is not likely that she would have thought it fair that she should get $2000 additional out of the father's estate for the same reason.

In addition to the fact that the relationship between the two would not indicate any reason to believe that Mrs. Goodman ever intended that Mrs. Serber should have any property right

in the bank deposit, it is also the fact that she never said or did anything from which such an intent could be inferred. In fact, there is nothing which Mrs. Serber herself ever said or did prior to her mother's death which would indicate that she believed that she had any property rights in the account.

On all the evidence, therefore, it is found that in setting up the account it was the intention of Mrs. Goodman, whose money it was, to retain the ownership of the deposit. Her only reason for opening it as a joint account and in maintaining it as such was in order that withdrawals might conveniently be made for her use or the use of her household. She never had any intention of creating any property right in that account in Mrs. Serber.

The form of a deposit, although it is some evidence of the intention of the depositor in making it, is not conclusive as to the rights of the persons named in connection therewith. *Stamford Savings Bank* v. *Everett*, 132 Conn. 92, 94; *Main's Appeal*, 73 Conn. 638, 642. Where a deposit is made by one person in his name and that of another not his wife, even though it is made payable to either or the survivor, the presumption is that no gift was intended. The person other than the owner of the money deposited, claiming that such a deposit creates a property right in it in him, must show that the depositor had such an intention. *Kennel* v. *Kennel*, 128 Conn. 200,203. In the present case, not only has Mrs. Serber failed to carry that burden but on the other hand the evidence all points to the conclusion that Mrs. Goodman's intention was not to create in Mrs. Serber any property in the account.

Judgment may enter directing the defendant bank to deduct from the deposit referred to in the complaint the sum of $150 as counsel fees, plus its other disbursements, and to pay the balance of said account over to the defendant Ralph R. Rakosky as administrator. Such payments having been made, said defendant bank shall be relieved and discharged from all liability to all persons on account of said deposit. No costs shall be taxed in favor of any party.